UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------x

CHAD JOHNSON,

                    Petitioner,             **MEMORANDUM & ORDER**
                                          16-CV-2825(EK)

          -against-

WARDEN OF DOWNSTATE CORRECTIONAL
FACILITY,

                    Respondent.

------------------------------------x

ERIC KOMITEE, United States District Judge:

        Chad Johnson, proceeding *pro se*, petitions the Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Johnson challenges his 2011 conviction in Suffolk County Supreme Court for the second-degree murder of Jennifer Papain. Johnson has always admitted that he hired Papain for a sexual encounter, and he confessed to law enforcement that when Papain told him that his time was up, he "snapped" and choked her. He also showed detectives where he buried her body. However, at trial (and during his efforts to overturn his conviction and sentence), he maintained that Papain died of a drug overdose and that key parts of his confession were coerced. After the jury convicted, the court sentenced Johnson to twenty-five years to life.

        Johnson raises six arguments in his amended petition. *First*, he contends that that he received constitutionally

ineffective representation due to a litany of failures on the part of his trial counsel. *Second*, he contends that he was denied a fair trial because of the prosecutor's misconduct during summation. *Third*, he contends that the state courts' rejection of his *Brady* and *Giglio* claims relating to a lawsuit involving Detective Sergeant Doyle, who supervised the investigation into Papain's disappearance, was contrary to clearly established federal law. *Fourth*, he contends that newly discovered evidence of past misconduct by law enforcement officers is so compelling that it would be fundamentally unfair not to grant him a new trial. *Fifth*, he contends that the evidence of his guilt was legally insufficient and that the verdict was against the weight of the evidence. *Sixth,* he contends that the testimony of a state medical examiner exceeded the proper bounds of expert testimony. *See* Am. Pet. ("Pet."), ECF No. 20.  For the reasons that follow, Johnson's application is denied.

## I.   Background

## A.        The Death of Jennifer Papain and the Ensuing Investigation

The testimony at trial established the following facts.  On March 24, 2010, Jorge Gonzalez dropped off Jennifer Papain at the Bay Shore Inn in Bay Shore, New York.  St. Ct. R.

vol. 3, at 65:17–66:10, ECF No. 8-2.[1]  Papain said she was going to get some "pills," but two hours later, she still had not returned.  *Id.* at 209:19-210:14.  Gonzalez then notified Papain's father, who eventually contacted the Suffolk Police Department.  *Id.* at 147:24–148-3, 214:18–216-3.  Papain's father later testified that he understood Gonzalez to be his daughter's pimp.  *Id.* at 127:3–8.

Suffolk County police soon learned that just prior to Papain's disappearance, she had received a call from Johnson. *Id.* at 270:4-17.  On April 6, detectives located Johnson and interviewed him in a police car outside his house.  *Id.* at 268:12–18, 271:6–272:18.  According to Detective Sergeant Pulaski's trial testimony, Johnson told the detectives that he had contacted Papain to arrange a sexual encounter and that they had agreed to meet at the Bay Shore Inn.  *Id.* at 273:8–16.  He said that he had driven her to Kings Laundromat, where he received oral sex from Papain for the agreed-upon price of $80. *Id.* at 273:17–24.  He then claimed to have dropped her off back at the Bay Shore Inn.  *Id.* at 273:24–274:1.

Three days later, on April 9, two different detectives (Soto and Comiskey) interviewed Johnson outside his home again. *Id.* at 562:22–564:10.  Johnson's account differed from the one

---

[1] Page numbers in citations to record documents refer to ECF pagination.

he had given days prior.  According to Soto's trial testimony, Johnson said that he had driven Papain from the Bay Shore Inn to a friend's house, where he parked and received oral sex from her.  *Id.* at 565:17-566-4.  He claimed that after he ejaculated, he dropped her off "at the corner."  *Id.* at 566:4-6, 569:17-570:6.  Soto wrote a statement summarizing this account, which Johnson signed under oath.  *Id.* at 570:14-579-8.

On May 24, Detective Sergeant Robert Doyle, who was supervising the investigation, ordered that Johnson be arrested for patronizing a prostitute.  *Id.* at 592:11-594:2.  At police headquarters, Soto and Comiskey again questioned Johnson.  *Id.* at 597:5-8.  Johnson maintained that his April 9 statement was accurate, even after the detectives confronted him with the inconsistency about where he dropped off Papain.  St. Ct. R. vol. 4, at 56:22-57-16, ECF No. 8-3.  He also claimed that his brother, Dartanion, could provide an alibi concerning his whereabouts.  *Id.* at 59:7-16.

The detectives located Dartanion and arrested him on an outstanding warrant.  *Id.* at 318:16-319:25.  Once Dartanion arrived at police headquarters, Soto resumed questioning Johnson.  Soto told Johnson that Dartanion had been brought to the precinct, was "very upset," and wanted Johnson to tell the police what had happened.  *Id.* at 68:23-69:3.  Johnson then

agreed to "tell [Soto] what happened" if he were allowed to have a cigarette and see his brother.  *Id.* at 69:6-19.

After Johnson was allowed briefly to talk with Dartanion, Soto took Johnson outside to smoke a cigarette.  *Id.* at 70:11-71:11.  In Soto's retelling at trial, Johnson told him that at some point during his sexual encounter with Papain, she had told him that his time had elapsed.  *Id.* at 72:4-6.  Johnson had not yet completed the sex act in question, however, and demanded Papain return half of his money.  *Id.* at 72:6-9.  When Papain refused, Johnson "got mad," "just snapped," reached over, and choked her in the front seat of the car.  *Id.* at 71:23-25, 72:12-13.

Johnson then agreed to lead Soto and Comiskey to Papain's body.  *Id.* at 72:20-73:23.  Along the way, just before entering the woods, he pointed out a red plastic bucket in which he had previously placed three plastic bags, which were still there.  *Id.* at 74:3-13.  He said he had used the bags to store leaves that he poured over Papain's body.  *Id.* at 74:13-18. After the group headed deeper into the woods, Johnson indicated that Papain's body was buried somewhere near a fallen tree.  *Id.* at 74:19-75:14.

Soto then drove Johnson back to headquarters.  *Id.* at 76:7-8.  On the way back, Johnson said that he had been "honest"

with the police, and proclaimed that "the only thing" he had not
told them was "that I killed her." *Id.* at 77:20–22.

Back at police headquarters, Soto and Comiskey resumed
questioning Johnson. St. Ct. R. vol. 4, at 78:2–15. Johnson
again described how he choked Papain, detailing that he used
both hands to "press[] her head against the window . . . until
she went limp." *Id.* at 79:19–80:6. After killing Papain, he
dragged her body out of his car into the woods. *Id.* at 81:21–
25. Johnson went home to retrieve a shovel, then returned to
the body and dug a hole. *Id.* at 83:3–5. He removed Papain's
clothes, including (he said) her flip-flops, and put them into a
plastic bag. *Id.* at 83:5–15. He put Papain's body in the hole,
covered it with dirt, and poured over the site a few garbage
bags' worth of leaves (the same bags later found in the red
bucket Johnson identified). *Id.* at 83:15–21. A few days later,
he disposed of Papain's clothes by dousing them in gasoline and
burning them in a garbage can. *Id.* at 84:21–85:7.

Soto wrote a second statement memorializing this
account, which Johnson also signed. *Id.* at 86:3–12, 101:24–
102:7 ("I jumped over to her side of the car and grabbed her by
the neck. I started choking her with two hands as I forced her
head against the front passenger side window. I kept choking
her until she went limp . . . . I checked her pulse and
realized she was dead."). Soto and Comiskey then showed Johnson

a missing persons flier of Papain.  *Id.* at 121:5-9.  Johnson

told the detectives "[y]eah, that's her," and "[t]hat's the girl

I killed."  *Id.* at 121:9-11.  At Soto's prompting, Johnson wrote

"[t]hat's the girl I killed" on the flier before signing and

dating it.  *Id.* at 121:12-18.

    Police later located Papain's body about 150 feet from

where Johnson said he had buried her.  St. Ct. R. vol. 3, at

367:14-368-8.  The Suffolk County Crime Lab later found a pair

of green flip-flops, among other items, in the car Johnson drove

on March 24.  St. Ct. R. vol. 5, at 17:14-18:21, ECF No. 8-4.

**B.**     **The Trial**

    Johnson was indicted for the second-degree murder of

Jennifer Papain; patronizing a prostitute in the third degree;

aggravated unlicensed operation of a motor vehicle in the second

degree; and unlawful possession of marijuana.  St. Ct. R. vol.

3, at 6-9.

    At trial, the State's medical expert, Dr. Hajar Sims-

Childs, testified that the "cause of death was asphyxia caused

by another person."  St. Ct. R. vol. 5, at 264:15-16.  She

reached this conclusion indirectly — by eliminating other

possible causes, as the decomposition of the body made it

impossible to detect bruises or abrasions to the neck area,

which would normally be evidence of death by asphyxia.  *Id.* at

267:17-268:3.  She testified that Papain's body showed signs of

recent defensive wounds.  *Id.* at 259:14-17.  And she took issue with the defense's overdose theory, testifying that while the toxicological analysis found various drugs, including hydrocodone and methadone, in Papain's body, those drugs were not present at "the level that would cause death."  *Id.* at 279:16-280:11; 282:18-20; 284:5-11.

The State also played for the jury a recorded telephone conversation between Johnson and his then-girlfriend, Paulette Johnson, who had become Johnson's wife by the time of trial.  St. Ct. R. vol. 6, at 118:18-119:8, ECF No. 8-5.  In that conversation, Paulette said to Johnson, "You committed a murder but you're not a murderer.  You get what I mean when I say that?  You committed a murder but it was by mistake.  You understand?  Intent to kill is a murderer.  You understand what I'm saying?  You're not a murderer.  You just committed a murder."  *Id.* at 116:9-19.  During the conversation, Johnson told Paulette that he wanted to plead guilty.  *Id.* at 122:6-16.

Finally, the State introduced evidence that the pair of green flip-flops recovered from the car Johnson drove contained DNA that was consistent with Papain's and that could not have belonged to Johnson or Paulette.  *Id.* at 135:3-14, 137:10-15.  Forensic evidence also showed that an empty plastic container recovered from the trunk of the car had held gasoline.  *Id.* at 68:14, 71:13-14.

Defense counsel conceded that Johnson had hired Papain for sex, but argued that she had died of an accidental drug overdose.  St. Ct. R. vol. 3, at 112:6–113:8, 116:14–17. Johnson's counsel argued that Johnson had "panicked" and buried her body.  *Id.* at 112:24–113:4.  He argued that detectives had "forced" and "coerce[d]" Johnson into confessing by threatening to arrest Dartanion.  *Id.* at 114:2–115–8.  In an effort to cast further doubt upon the reliability of Johnson's confession, counsel also argued that detectives had physically assaulted Johnson while he was in their custody.  St. Ct. R. vol. 6, at 426:19–430:9.

Paulette also testified for the defense.  She said that the green flip-flops belonged to her.  St. Ct. R. vol. 5, at 518:16–18.  The defense introduced photographs purporting to show Paulette wearing the flip-flips during a 2009 trip.  *Id.* at 518:19–521:3.  Paulette also testified that she kept a gasoline container in the trunk because Johnson frequently neglected to fill the gas tank of the car.  *Id.* at 529:23–530:17.

Finally, the defense called Dr. Charles Wetli, a former medical examiner.  He concluded that there was no evidence to support the conclusion that Papain died from manual strangulation.  St. Ct. R. vol. 6, at 147:2-5.  Nor could he opine with any reasonable degree of medical certainty whether Papain's death was caused by asphyxiation at all.  *Id.* at

149:21-150:2.  He also expressed doubt as to whether the wounds identified by Dr. Sims-Childs were defensive wounds.  *Id.* at 153:3-155:14.  Moreover, he testified that the combination of hydrocodone and methadone "could have" been factors in Papain's death.  *Id.* at 191:6-13.  Nevertheless, he admitted, it was impossible to "make any determination" with respect to the presence of those drugs because of the decomposing chest cavity fluids.  *Id.* at 191:14-21.

Following trial, the jury found Johnson guilty of second-degree murder, patronizing a prostitute, and aggravated unlicensed operation of a vehicle.  St. Ct. R. vol. 6, at 600–01.[2]

## II.  Procedural History

Johnson appealed his conviction to the Appellate Division, Second Department.  He argued (1) that Dr. Sims-Childs's testimony that Papain died of asphyxia at the hands of another should have been precluded as improper testimony on an ultimate issue of fact; (2) that the evidence was insufficient to support the conviction and the verdict was against the weight of the evidence; (3) that the prosecutor committed misconduct during summation; and (4) that his sentence was harsh and excessive.  St. Ct. R. vol. 1, at 1–54 (appellant's brief on

---

[2] The State moved to dismiss the possession of marijuana count.  St. R. vol. 6, at 623–24.

direct appeal), ECF No. 8.  Johnson did not argue, in his direct appeal, that trial counsel was constitutionally ineffective, despite being represented by a different lawyer on appeal.  *See* St. Ct. R. vol. 1, at 3.

The Second Department affirmed the conviction in December 2014.  *People v. Johnson*, 999 N.Y.S.2d 517 (App. Div. 2014).  The New York Court of Appeals denied Johnson's application for leave to appeal on March 25, 2015, rendering the conviction final.  *People v. Johnson*, 30 N.E.3d 171 (N.Y. 2015) (unpublished table decision); *see* St. Ct. R. vol. 1, at 12.

In March 2016, Johnson filed a *pro se* motion pursuant to New York Civil Procedure Law § 440.20 to set aside his sentence in the Supreme Court of New York, Suffolk County.  St. Ct. R. vol. 1, at 127–32.  The court denied this motion.  *People v. Johnson*, No. 014552010, 2016 WL 10673791 (May 10, 2016). Johnson did not seek leave to appeal.  In October 2016, Johnson filed a motion in the Appellate Division for a writ of error *coram nobis*, claiming that his *appellate* counsel was ineffective.  In May 2017, the court denied this motion, *People v. Johnson*, 52 N.Y.S.3d 233 (App. Div. 2017), and Johnson did not appeal it.

In May 2016, Johnson petitioned this Court for a writ of habeas corpus on a number of grounds, including that his *trial* counsel was ineffective.  Pet. for Writ of Habeas Corpus,

11

ECF No. 1.[3]  (Johnson does not argue ineffective assistance of
appellate counsel here.)  This claim was unexhausted at the
time, and the district judge then assigned ordered the case held
in abeyance so that Johnson could press it in state court.
Order dated Aug. 1, 2018.  Johnson did so via a new Section
440.10 motion to vacate his conviction.  Notice of Mot. 1, ECF
No. 25-1.  In April 2019, the Supreme Court denied this motion.
Supreme Ct. Decision, ECF No. 25-4.  Johnson appealed to the
Appellate Division, which denied his appeal in December 2019.
Decision & Order on Mtn., ECF No. 25-7.  In May 2020, the
Appellate Division also denied Johnson's motion for leave to
reargue the appeal.  Decision & Order on Mot., ECF No. 25-10.

On March 4, 2020, this case was transferred to me.
Dkt. Entry Dated Mar. 4, 2020.  In May 2021, Johnson filed an
amended habeas petition (the instant petition).  Pet., ECF No.

---

[3] It is somewhat unclear whether Johnson's federal petition is
timely.  *See* 28 U.S.C. § 2244(d).  Johnson's conviction became final on March
26, 2015, when the Court of Appeals denied his application for leave to
appeal.  *See id.* § 2244(d)(1)(A).  Thus, for his federal petition, filed May
31, 2016, to be timely, Johnson must have "properly filed" an application for
post-conviction relief in State court by March 26, 2016.  *See id.*
§ 2244(d)(2).

Under Rule 3(d) of the Rules Governing Section 2254 Cases in the
United States District Courts, "[a] paper filed by an inmate confined in an
institution is timely if deposited in the institution's internal mailing
system on or before the last day for filing."  The notarized statement
required by Rule 3(d) is illegible as to whether the date of mailing is March
21, 2016, or March 31, 2016.  But in any event, Respondent has forfeited any
defense as to the statute of limitations.  Resp't's Aff. & Mem. of Law in
Opp'n to Am. Pet. of Habeas Corpus 19 ("The petition is timely . . . ."), ECF
No. 25; *see also Wood v. Milyard*, 566 U.S. 463, 470-73 (2012) ("[D]istrict
courts[] have the authority — though not the obligation — to raise a
forfeited timeliness defense on their own initiative.").  Given the state's
concession, I proceed to consider the petition here.

20.  As of that time, however, Johnson still had not exhausted his claim that his trial counsel was deficient for failing to investigate and uncover evidence that Detective Doyle had coerced confessions from defendants in prior unrelated cases, as Johnson did not make that argument to any state court, including to the Supreme Court in his 2018 motion under Section 440.10. *See* Pet. 9.  Therefore, Johnson sought to withdraw this claim. *See* Mot. to Withdraw Unexhausted Claim, ECF No. 26.  I granted that request.  *See* Tr. of Proceedings on Oct. 14, 2021, at 5:2–7, ECF No. 31.

## III. Analysis

## A.    Ineffective Assistance of Counsel

Johnson argues here that he was deprived of his right to effective assistance of counsel because his trial counsel, William Ferris: (1) "denied" him the right to testify on his own behalf; (2) did not arrange for independent DNA testing on the green flip-flops; (3) did not engage a Spanish interpreter during the cross-examination of Jorge Gonzalez; and (4) failed to investigate Johnson's psychological history.

As noted above, Johnson has exhausted the remaining components of his ineffective-assistance claim: he "fairly present[ed]" them to the New York Supreme Court, "alerting that court to the federal nature of the claim," and thus giving the state "the opportunity to pass upon and correct alleged

13

violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (internal quotation marks and citations omitted).  Therefore, I now turn to the merits of the insufficiency claim.

The state Supreme Court rejected Johnson's ineffective assistance claim on the grounds that it could have been raised on direct appeal or in one of his prior motions for postconviction relief, and thus was procedurally barred under state law.  *See* Supreme Ct. Decision 3.  Respondent, however, explicitly "does not rely on" the finding of procedural default. Resp't's Aff. & Mem. of Law in Opp'n to Am. Pet. of Habeas Corpus 46 & n.2, ECF No. 25.  Accordingly, that defense is waived.  *See Trest v. Cain*, 522 U.S. 87, 89 (1997) ("[P]rocedural default is normally a defense that the State is obligated to raise and preserve if it is not to lose the right to assert the defense thereafter."); *see also Moore v. New York*, 357 F. App'x 398, 399 (2d Cir. 2009) (procedural default did not "preclude . . . review of the case . . . because, although the state court determined that Moore had failed timely to raise his ineffective assistance claim [under section 440.10], respondent does not argue procedural bar in opposition to federal habeas relief").

Because the state courts did not review the merits of the ineffective assistance claim, I review them *de novo*.  *See*

*Cotto v. Herbert*, 331 F.3d 217, 230 (2d Cir. 2003).
Nevertheless, even absent AEDPA deference, the *Strickland*
"standard for judging counsel's representation is a most
deferential one." *Harrington v. Richter*, 562 U.S. 86, 105
(2011).  To demonstrate ineffective assistance, a party first
must show that counsel's performance "fell below an objective
standard of reasonableness" in light of "prevailing professional
norms." *Strickland v. Washington*, 466 U.S. 668, 688 (1984).
To satisfy this performance prong, a petitioner must show that
counsel's performance was "outside the wide range of
professionally competent assistance." *Id.*  Even if a petitioner
makes this showing, he must also satisfy the prejudice prong;
that is, he must show "that there is a reasonable probability
that, but for counsel's unprofessional errors, the result of the
proceeding would have been different." *Id.* at 694.  In other
words, prejudice requires that "counsel's errors were so serious
as to deprive the defendant of a fair trial." *Id.* at 687.  A
court may reject an ineffective assistance claim for failure to
satisfy either prong, without reaching the other.  *Id.* at 697.

       Johnson has satisfied neither prong for any of his
ineffective assistance claims.  I discuss each claim in turn.

   1.   Johnson's Ability to Testify

       Johnson argues that his attorney was deficient for
failing to inform him that it was his decision to testify or

not, and indeed affirmatively "prevented" him from testifying. He says that had he testified, he would have explained the inconsistencies in his statements to police, contradicted the accounts of Detective Soto and the State's forensics expert, and further corroborated his claim that he was assaulted by detectives.  Pet. 6, 38-46.

A "defendant's right to testify in his own defense is personal and may not be waived by his attorney over the defendant's opposition, regardless of tactical considerations." *United States v. Noorzai*, 953 F. Supp. 2d 499, 507 (S.D.N.Y. 2013) (citing *Brown v. Artuz*, 124 F.3d 73, 77-78 (2d Cir. 1997)).  Defense counsel defaults on that obligation "either by failing to inform the defendant of the right to testify or by overriding the defendant's desire to testify."  *Brown*, 124 F.3d at 79.  Nevertheless, "the burden of proving such a claim in a collateral attack rests with the defendant."  *Botero v. United States*, Nos. 96-CR-0145, 00-CV-1922, 2005 WL 1606911, at *2 (D. Conn. July 6, 2005); *see also Brown*, 124 F.3d at 74 ("[T]he two-part test established in *Strickland v. Washington* . . . should be used to assess a defendant's claim that defense counsel rendered ineffective assistance by preventing him from testifying.").  Johnson fails to meet this burden.

Johnson cites the following colloquy:

**MR. FERRIS:** Well, the upshot of this is that he wants to testify.

**[ASSISTANT DISTRICT ATTORNEY] PETTIGREW:** That's an upshot?

**MR. FERRIS:** That's what he did.  This, is in my opinion, is to push him on the stand.

**LAW CLERK:** The jury to get out [sic] so he can get on the stand?

**MR. FERRIS:** Well —

**THE COURT:** Who do you want to call next is the question.  The fact that he is wants to testify is —

**MR. FERRIS:** Yeah, but the issue is that if he was going to testify, I was going to put Wetli on after his testimony.  And that was the issue last night. Because if he was going to testify, I would have my client testify first before Dr. Wetli.  I called Dr. Wetli to come in and I spoke to Mr. Pettigrew.  My client is not testifying.

**THE COURT:** That was before.

**MR. FERRIS:** I understand that.  So this has changed the circumstances.

**THE COURT:** Okay.  So, then, you got to call somebody.

. . .

**THE COURT:** [I]f you're going to use Wetli, I will try and call and get permission that we can finish him today.

**MR. FERRIS:** Let me just have a minute.  I don't think that's going to happen.

**THE COURT:** Well, then, can you start off at least with him.  We got to do something.

**MR. FERRIS:** Let me just – can you excuse the jury for a minute just so I can talk to Chad [Johnson] in here. I know what I want to do.  I just want him to know

17

> what I want to do next.  And I'm not sure he is going
> to be in agreement.  I just need to let him know what
> I want to do next.

St. Ct. R. vol. 6, at 126:3-127:25.

This discussion does not show Johnson being prevented from testifying or misinformed as to his rights.  On the contrary, it concludes with his counsel indicating that he intends to "talk to" Petitioner.  And the repeated references to what counsel "want[s]" to do (rather than "will do" or "intends to do") reflects an acknowledgment the decision rests with the client, as does counsel's statement that he is not sure his client will "be in agreement."

Moreover, the state has submitted an affirmation from Mr. Ferris, in which he avers that he "made it clear to Mr. Johnson during all stages of the proceedings that the decision as to whether he testified in his own defense was his alone." Ferris Aff. at 57 ¶ 9, ECF No. 25-2.  On this record, Johnson has not carried his burden to demonstrate that he was misinformed about his rights or otherwise "prevented" from testifying.  *See Chang v. United States*, 250 F.3d 79, 86 (2d Cir. 2001) (upholding ruling that the performance prong was not established where the only evidence that defendant was prevented from testifying came from "his own blanket statements"); *Underwood v. Clark*, 939 F.2d 473, 476 (7th Cir. 1991) (defendant's "barebones assertion" that counsel forbade him to

18

testify was "too facile a tactic to be allowed to succeed"; instead, some "substantiation is necessary, such as an affidavit from the lawyer who allegedly forbade his client to testify").

    2.  <u>DNA Tests</u>

Johnson next argues that his counsel was obligated to arrange for independent forensic testing of the green flip-flops found in Johnson's car.  Pet. 6-8.  Johnson contends that the flip-flops belonged to his wife, not Jennifer Papain.  If an independent DNA test showed no trace of Papain's DNA, Johnson argues, it would have provided critical exculpatory evidence — not only undermining the State's forensic examiner, but also showing the falsity of Detective Soto's testimony that Johnson admitted to removing all of the victim's clothes (including the flip-flops) and burning them.  Johnson argues that this evidence would have given credence to his defense that his confession had been coerced.

There is no indication that defense counsel's decision not to seek additional DNA testing was anything but strategic, let alone constitutionally infirm.  *See Dunham v. Travis*, 313 F.3d 724, 732 (2d Cir. 2002) ("Decisions . . . [that] are strategic in nature . . . generally will not support an ineffective assistance claim." (alterations accepted and quotations omitted)); *Hai Guang Zheng v. Warden, Sing Sing Correctional Facility*, No. 16-CV-1166, 2019 WL 4469085, at *8

(E.D.N.Y. September 18, 2019) ("[C]ounsel made the strategic, prudent decision not to conduct DNA testing" where DNA test result "would not foreclose Petitioner's guilt."). *See Baran v. United States*, 160 F. Supp. 3d 591, 596 (S.D.N.Y. 2016) (a court reviewing a claim for ineffective assistance of counsel is not permitted to "use hindsight to second guess [counsel's] strategy choices").  Here, the question of whether the flip-flops belonged to the decedent or the Petitioner's girlfriend was not the central issue in the case.  Moreover, counsel could rationally have seen some strategic downside in soliciting another DNA test: if the second test confirmed the State's result, counsel may have been ethically prohibited from eliciting testimony on the subject from Paulette and from making related arguments in summation.  *See* N.Y. Rule of Pro. Conduct 3.3(a)(3) ("A lawyer shall not knowingly . . . offer or use evidence that the lawyer knows to be false.") (codified as amended as an appendix to N.Y. Jud. Law).

    Moreover, even if trial counsel's decision not to introduce the available DNA evidence fell below an objective standard of reasonableness, Johnson has not shown that this failure prejudiced him, given the totality of the evidence introduced at trial — including not only (a) the forensic testimony regarding the decedent's cause of death and (b) Petitioner's multiple oral and written confessions, but also the

undisputed fact that Petitioner led the police to the body.  *See* St. Ct. R. vol. 504:22–510:23.

    3.  Spanish Interpreter

Johnson next claims that his counsel was ineffective for failing to employ a Spanish interpreter during the testimony of Jorge Gonzalez.  Pet. 8.  Before the Supreme Court, he argued that this resulted in Gonzalez being unable to "fully understand[] [counsel's] questions."  Affirmation 22, ECF No. 25-1.  But Johnson's claim is belied by the record, which shows that Gonzalez was able to testify coherently without an interpreter.  While Gonzalez stated that he was "not really good" at English, St. Ct. R. vol. 3, at 221:3-5, once the court slowed the questions down, the transcript reveals him proceeding without difficulty.  Nor does Petitioner indicate how, specifically, the alleged language barrier prejudiced his case. Gonzalez testified as a state witness, not a defense witness, and his testimony largely concerned the background — most importantly, how and why Papain went to the motel in question. These facts were not central to the state's proof, if they were disputed at all.  *See United States v. Maniego*, 710 F.2d 24, 26 (2d Cir. 1983) (ineffective-assistance claim based on counsel's decision not to obtain an interpreter failed, where subject testimony not integral to the verdict).

4. <u>Psychological Examination</u>

Johnson claims that his counsel was ineffective for failing to investigate his "psychological history."  Pet. 8. Before the Supreme Court, he argued that a psychological examination "could have determined [Johnson] was susceptible to suggestion and manipulation and incapable of making reasonable and rational judgments."  Supreme Ct. Mot. 14–16.  He argues now that such an investigation could have supported his coercion defense or a finding he was incompetent to stand trial.

Johnson's claim does not meet the *Strickland* standard. In his affirmation, Ferris stated that based on his numerous conversations with Johnson before his trial, he did not feel that having Johnson examined by a psychologist would have aided in his defense.  *See* Ferris Aff. 57 ¶ 8.  Ferris's explanation is more than sufficient to rebut a claim of ineffective assistance.  *United States v. Marmorato*, 107 F. App'x 244, 246 (2d Cir. 2004); *see also Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005) ("A lawyer's decision not to pursue a defense does not constitute deficient performance if, as is typically the case, the lawyer has a reasonable justification for the decision.").  Nothing in the record contradicts this determination.  There is no basis to conclude that counsel acted unreasonably in not pursuing a mental health evaluation.

**B.   Alleged Prosecutorial Misconduct in the Summation**

Johnson asserts that the assistant district attorney committed misconduct by stating during summation: "He wanted to plead guilty . . . . Give him what he wants.  Tell him how Jennifer Papain wasn't trash.  She wasn't garbage."  Pet. 11; *see* St. Ct. R. vol. 6, at 510:8–11.[4]  On direct appeal, he contended that these remarks violated his due process rights under the Fourteenth Amendment.  St. Ct. R. vol. 1, at 47–51. He argued that the reference to the possible guilty plea improperly referred to Johnson's "consciousness of guilt."  *Id.* at 50.  Moreover, he argued that by characterizing Johnson as treating Papain like "garbage" or "trash," he improperly "inflamed the passions of the jury."  *Id.* at 48.

I need not reach the question of whether this was improper, however, because this claim is procedurally barred in light of Johnson's counsel's failure to object.[5]  A federal court may not, on habeas review, reconsider the judgment of a state court that rests on a ground of procedural default that is "independent of the federal question and adequate to support the judgment."  *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). To be

---

[4] The reference to Johnson's earlier desire to plead guilty appears to have referred to his recorded conversation with Paulette.  *See* St. Ct. R. vol. 6, at 122:9–16.

[5] Johnson does not assert before this Court that defense counsel was deficient for failing to object to these portions of the summation.

"independent" of federal law, the court's "reliance on state law must be clear from the face of the opinion." *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 809 (2d Cir. 2009).  To be "adequate," the state-law rule must be "firmly established and regularly followed" by courts of the state.  *Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir. 1999).

Here, because the Second Department was last to opine on this claim, *see Johnson*, 999 N.Y.S.2d at 517, that decision forms the basis of this Court's review.  The Appellate Division dismissed Johnson's claim as unpreserved under N.Y. Criminal Procedure Law § 470.05(2), which requires that a party seeking to preserve such an objection must "register[]" a "protest" during trial.  999 N.Y.S.2d at 518.  That ground "is both independent of any federal question and adequate under firmly established and regularly followed state law," and this Court therefore "need not reach or decide" this claim.  *Garvey v. Duncan*, 485 F.3d 709, 720 (2d Cir. 2007).

Still, in a habeas corpus proceeding, a federal court may reach the merits of a procedurally barred claim if the petitioner establishes that the absence of review will result in a "fundamental miscarriage of justice."  *Coleman*, 501 U.S. at 748; *see also Murray v. Carrier*, 477 U.S. 478, 496 (1986). Here, the prosecution's summation did not, even as alleged, work such a fundamental miscarriage of justice.

C.   *Brady* and *Giglio* Claims

Johnson next argues that the state violated its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972), and thus his Due Process rights, by withholding documents regarding the alleged misconduct in an unrelated case of Detective Doyle, who supervised the investigation into Papain's death.  Pet. 13-15. The Supreme Court rejected this claim as "meritless."  Supreme Ct. Decision 2.

Because the state court ruled on the merits of this claim, deference is due to its decision under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").[6]  Under AEDPA, a reviewing court may grant a writ of habeas corpus only if the state court's "adjudication of the claim" either "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or "resulted in a decision that was based on an unreasonable determination of the

_____

[6] A state court's conclusion that an argument is "meritless" suffices, even if unexplained, as state court review "on the merits" for purposes of AEDPA deference.  *See Murden v. Artuz*, 497 F.3d 178, 198 (2d Cir. 2007) ("[A]n unexplained ruling on the merits is also entitled to AEDPA deference.").

facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

A state court's decision is "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to" the Supreme Court's result.  *Bell v. Cone*, 543 U.S. 447, 452-53 (2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).  A state court's decision "involved an unreasonable application of" Supreme Court precedent if there is "no possibility fair-minded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents."  *Harrington v. Richter*, 562 U.S. 86, 102 (2011).  And a state court decision is based on an "unreasonable determination of the facts" if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case."  *Williams*, 529 U.S. at 407-08.  Even an incorrect determination by the state court must be upheld if reasonable.  *Id.* at 410.

*Brady* imposes on prosecutors "a constitutional duty to timely disclose material, exculpatory evidence to criminal defendants."  *United States v. Tang Yuk*, 885 F.3d 57, 86 (2d Cir. 2018).  "The Court extended that production duty in

*Giglio* . . . to cover evidence that could be used to impeach a government witness." *Id.*  To prove a *Brady* violation, a petitioner must show that: "(1) the Government, either willfully or inadvertently, suppressed evidence; (2) the evidence at issue is favorable to the defendant; and (3) the failure to disclose this evidence resulted in prejudice." *United States v. Coppa*, 267 F.3d 132, 140 (2d Cir. 2001).  "The Government's duty of disclosure, and the timing thereof, is assessed retrospectively, by reference to the likely effect that the suppression of particular evidence had on the outcome of the trial." *United States v. Douglas*, 415 F. Supp. 2d 329, 336 (S.D.N.Y. 2006), *aff'd*, 525 F.3d 225 (2d Cir. 2008).

In 2009, before Papain's death, a plaintiff named Martin Tankleff commenced a civil lawsuit in this District against Suffolk County and a number of law enforcement officers, including Detective Sergeant Doyle. *Tankleff v. County of Suffolk*, No. 09-CV-1207, 2015 WL 13264439, at *1 (E.D.N.Y. May 5, 2015).  Tankleff alleged that Doyle, in concert with other detectives, collectively obtained a falsified confession from him.  *See Tankleff v. County of Suffolk*, No. 09-CV-1207, 2010 WL 5341929, at *2 (E.D.N.Y. Dec. 21, 2010).  In 2018, Tankleff settled the case for a $10 million payment from the County, with no admission of wrongdoing.  *See* Stipulation of Settlement and

Discontinuance, *Tankleff v. County of Suffolk*, No. 09-cv-1207 (E.D.N.Y. Nov. 19, 2018), ECF No. 220.

Though Doyle supervised the instant investigation and directed the arrest of Johnson and his brother, his direct efforts during the investigation were limited.  In terms of his direct interaction with Johnson, Doyle interviewed Johnson for the "prisoner activity log" after Johnson's arrest.  St. Ct. R. vol. 2, at 369:11-13, ECF No. 8-1.  According to Detective Soto, the prisoner activity log reported a prisoner's "location" and "condition," as well as "[i]f they're moved" and "where they are moved."  St. Ct. R. vol. 2, at 532:19-533:2.  Its purpose was "basically to keep an eye on the prisoner while he's in our custody."  St. Ct. R. vol. 2, at 531:19-532:4.  Doyle did not testify in Johnson's trial.

Before the Supreme Court, Johnson argued that the state was obligated to bring the *Tankleff* case to the defense's attention because it would have bolstered the claim that his confession was "coerced [and] fabricated," and therefore unreliable evidence.  He also argued that *Tankleff* would have constituted impeachment evidence.  The State responds that the ADA prosecuting Johnson was unaware of the lawsuit; that the existence of the case was not exculpatory or required to be disclosed as impeachment material; and that, in any event, Johnson cannot show prejudice from any failure to disclose.

The state is correct that the information was not material.  The Tankleff case is not exculpatory, as it has no direct bearing on Petitioner's guilt or innocence.  *See United States v. Stofsky*, 527 F.2d 237, 247 (2d Cir. 1975) (evidence is not exculpatory where it "would not have affected one way or the other" any "key factual issue in dispute"); *see also United States v. Triumph Cap. Grp.*, 544 F.3d 149, 151 ("Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.") (2d Cir. 2008).  And the state was not required to disclose it as impeachment evidence, given that Doyle did not testify.  *See United States v. Rivas*, 377 F.3d 195, 199 (2d Cir. 2004) ("Impeachment evidence is evidence having the potential to alter the jury's assessment of the credibility of a significant prosecution witness.").  Given these conclusions, I need not reach the question of whether the information was in the state's "possession" for *Brady* and *Giglio* purposes.  *See United States v. Hill*, 279 F. App'x 90, 94 (2d Cir. 2008) (where evidence is not exculpatory, the government does not violate *Brady* even if it was in possession of that evidence).

Accordingly, the state court's conclusion that there was no *Brady* or *Giglio* violation was not contrary to, nor involved an unreasonable application of, "clearly established

Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

## D.   Newly Discovered Evidence

Johnson claims that there exists newly discovered evidence relating to (1) the Tankleff / Doyle lawsuit, and (2) the 2015 assault and conspiracy prosecution of Suffolk County Police Chief James Burke.  Pet. 17–21.  Johnson argues that this evidence shows Suffolk County detectives' "willi[ng]ness to engage in misconduct in order to conceal their corruption" and therefore supports his claim at trial that his confession was "coerced and fabricated."  Pet. 21.  Johnson exhausted this claim in his 2019 motion to the Supreme Court.  *See* Supreme Ct. Mot. 25–27.  That court rejected the claim on the merits, reasoning that "the evidence . . . would not have been admissible at [Johnson's] trial."  Supreme Ct. Decision 2.

Generally, petitioners are not entitled to habeas corpus relief on the independent ground that there is "newly discovered evidence" of their innocence.  *Ortega v. Duncan*, 333 F.3d 102, 108 (2d Cir. 2003); *see also Herrera v. Collins*, 506 U.S. 390, 400 (1993).  For newly discovered evidence to warrant habeas relief, the petitioner must show that the evidence is "so compelling that it would be a violation of the fundamental fairness embodied in the Due Process Clause" for the conviction to stand.  *White v. Keane,* 51 F. Supp. 2d 495, 502 (S.D.N.Y.

1999); *see also Herrera*, 506 U.S. at 400 ("Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding.").  A court must then "decide whether the jury probably would have altered its verdict if it had had the opportunity to appraise the impact of the newly-discovered evidence not only upon the factual elements of the government's case but also upon the credibility of the government's witness." *United States v. Stofsky*, 527 F.2d 237, 246 (2d Cir. 1975).  If so, courts will vacate the conviction and "order [the petitioner's] release unless the state promptly affords him a new trial."  *Ortega*, 333 F.3d at 109.

The *Tankleff* and *Burke* matters are not evidence — let alone compelling evidence — of Johnson's innocence.  As discussed, the lawsuit against Doyle would not have been relevant to Johnson's defense at trial.  And the allegations against Burke are even further removed from Johnson's case than those against Doyle, given that there is no evidence that Burke was directly involved in the investigation of Johnson's case or the taking of his confession.  *See* Indictment, *United States v. Burke*, No. 15-CR-0627 (E.D.N.Y. Dec. 8, 2015), ECF No. 1.  In any event, Johnson does not articulate any basis on which the lawsuit against Doyle or the prosecution of Burke would have

31

been admissible, contrary to the trial court's finding.  Thus, the state court's rejection of this claim was not unreasonable under AEDPA.

**E.   Legal Insufficiency and Weight of the Evidence**

Johnson next contends that the evidence presented at trial was legally insufficient to prove he was guilty of second-degree murder and that the verdict was against the weight of the evidence.  Pet. 23–27.

Johnson's claim that the verdict was against the *weight* of the evidence is "not reviewable in [a] federal habeas proceeding."  *See Blake v. Martuscello*, No. 10-CV-2570, 2013 WL 3456958, at *9 (E.D.N.Y. July 8, 2013) (collecting cases). Thus, all that remains is his attack on the *sufficiency* of the evidence supporting his conviction.

Although Johnson does not affirmatively assert a deprivation of any particular constitutional right, I construe his sufficiency-of-the-evidence claim as arising under the Due Process Clause of the Fourteenth Amendment, as he did on direct appeal.  *See* St. Ct. R. vol. 1, at 40.  The state court denied this claim on the merits, holding that "viewing the evidence in the light most favorable to the prosecution . . . it was legally sufficient to establish the defendant's guilt of murder in the second degree beyond a reasonable doubt."  *Johnson*, 999 N.Y.S.2d at 1055.

The Due Process Clause prohibits conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [the defendant] is charged." *In re Winship*, 397 U.S. 358, 364 (1970).  Consequently, a state prisoner "is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979) (footnote omitted).  A due process challenge to the sufficiency of the evidence "is a mixed question of law and fact, and therefore analyzed under § 2254(d)(1), not § 2254(d)(2)." *Torres v. Greene*, 290 F. Supp. 2d 396, 400 n.3 (S.D.N.Y. 2003).  Reviewing courts "defer to the jury's assessment of witness credibility and the jury's resolution of conflicting testimony." *United States v. Bala*, 236 F.3d 87, 93–94 (2d Cir. 2000).

When reviewing a conviction for sufficiency of the evidence, "federal courts must look to state law for 'the substantive elements of the criminal offense.'" *Coleman v. Johnson*, 566 U.S. 650, 655 (2012) (quoting *Jackson*, 443 U.S. at 324 n.16).  Moreover, because the Appellate Division denied this claim on the merits, *see* 999 N.Y.S.2d at 517, the deferential standards of AEDPA apply.  *See* 28 U.S.C. § 2254(d).

At trial, the prosecution presented ample evidence to support the convictions.  It is uncontested that Jennifer Papain died in Johnson's vehicle after he paid her for a sexual act. He then concealed her naked body in a remote location in the woods, burned her clothes, and disposed of her cell phone. Moreover, the defense theory of the case — that Jennifer died of a drug overdose — was not supported by strong forensic evidence. Although Dr. Wetli testified for the defense that "the combination of both hydrocodone and methadone [in Papain's body] could have been a factor" in her death," St. Ct. R. vol. 6, at 191:4-5, the State's medical examiner testified that the amount of drugs in Jennifer's system would not have been fatal. Further evidence from the Chief Toxicologist for Suffolk County supported the examiner's determination.  And in the face of conflicting expert testimony, a habeas court is generally obligated to defer to the jury's finding.  *See United States ex rel. Bornholdt v. Ternullo*, 402 F. Supp 374, 378 (S.D.N.Y. 1975) (where a "'battle of the experts' was fairly posed to the jury[,] [it] thereupon became a question of fact for them to resolve").  Moreover, Johnson provided a written statement, signed under oath, confessing to her murder, in addition to confessing (or at least significantly incriminating himself) on multiple occasions.  Moreover, on a recorded line, Johnson's then-girlfriend acknowledged his having killed the decedent —

information the jury could have concluded she learned from Johnson.  St. Ct. R. vol. 6, at 116:9-18.  In light of the substantial evidence of Johnson's guilt, the state court's determination that the evidence was legally sufficient to support the verdict was, at the very least, reasonable, especially under the deferential standards of AEDPA.

**F.   Medical Examiner Testimony**

Finally, Johnson claims that the testimony of Dr. Sims-Childs exceeded the proper bounds of expert testimony when she stated that Jennifer's cause of death was "asphyxiation caused by another."  Johnson contends that the examiner made this statement despite inconclusive physical evidence.

This claim is procedurally defaulted, given that Johnson's counsel did not object to the testimony.  The Appellate Division determined that Johnson's complaint relating to the medical examiner's testimony was unpreserved for appellate review under N.Y. Crim. Proc. Law § 470.05(2).  *See Johnson,* 123 A.D.3d at 1055.  As discussed above, this ground constitutes an adequate and independent state ground for the decision, which bars habeas review.  Moreover, Johnson has not stated a satisfactory basis on which his counsel should have objected to this testimony at trial, or demonstrated prejudice or a miscarriage of justice as a result.  Accordingly, this claim fails.

## IV.   Conclusion

For the foregoing reasons, the petition is denied.  A certificate of appealability shall not issue because Johnson has not made a substantial showing that he was denied any constitutional rights.  *See* 28 U.S.C. § 2253(c)(2).  The Court certifies that any appeal of this order would not be taken in good faith, and thus *in forma pauperis* status is denied for the purposes of any appeal.  *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

SO ORDERED.


__/s/ Eric Komitee_____
ERIC KOMITEE
United States District Judge


Dated:     March 17, 2022
           Brooklyn, New York